United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| C.R.,<br><br>    Plaintiff,<br><br>  v.<br><br>COMMISSIONER OF SOCIAL<br>SECURITY, et al.,<br><br>    Defendants. | Case No. 24-cv-08672-JCS<br><br>**ORDER RESOLVING SOCIAL<br>SECURITY ACTION**<br><br>Re: Dkt. No. 12 |

## I. INTRODUCTION

Plaintiff C.R.[1] brings this action challenging the decision of Defendant the Commissioner of Social Security ("the Commissioner")[2] denying C.R.'s application for disability benefits. The parties have consented to the jurisdiction of a magistrate judge for all purposes under 28 U.S.C. § 636(c) and filed briefs on the merits in accordance with the Federal Rules of Civil Procedure's Supplemental Rules for Social Security Actions Under 42 U.S.C. § 405(g). For the reasons discussed below, the Court finds in favor of C.R. The Commissioner's decision is REVERSED, and the case is REMANDED for further administrative proceedings consistent with this Order.

## II. REGULATORY FRAMEWORK FOR DETERMINING DISABILITY

### A. The Five-Step Framework

Disability insurance benefits are available under the Social Security Act (the "Act") when

---

[1] Because opinions by the Court are more widely available than other filings and this Order contains potentially sensitive medical information, this Order refers to Plaintiff using only his initials. This Order does not alter the degree of public access to other filings in this action provided by Rule 5.2(c) of the Federal Rules of Civil Procedure and Civil Local Rule 5-1(c)(5)(B)(i).

[2] Commissioner Frank Bisignano assumed that role while this case was pending and is therefore automatically substituted as the defendant in this case under Rule 25(d) of the Federal Rules of Civil Procedure.

an eligible claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant is only found disabled if their physical or mental impairments are of such severity that they are not only unable to do their previous work but also "cannot, considering [their] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Commissioner has established a sequential, five-part evaluation process to determine whether a claimant is disabled under the Act. *See Tackett v. Apfel,* 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520). The claimant bears the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five. *Id.* "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps." *Id.*

At step one, the ALJ considers whether the claimant is presently engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is engaged in such activity, the ALJ determines that the claimant is not disabled, and the evaluation process stops. *Id.* If the claimant is not engaged in substantial gainful activity, the ALJ continues to step two. *See id.*

At step two, the ALJ considers whether the claimant has "a severe medically determinable physical or mental impairment" or combination of such impairments that meets the regulations' twelve-month durational requirement. 20 C.F.R. §§ 404.1509, 404.1520(a)(4)(ii). An impairment or combination of impairments is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant does not have a severe impairment, disability benefits are denied. 20 C.F.R. § 404.1520(a)(4)(ii). If the ALJ determines that one or more impairments are severe, the ALJ proceeds to the next step. *See id.*

At step three, the ALJ compares the medical severity of the claimant's impairments to a list of impairments that the Commissioner has determined are disabling ("Listings"). *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1. If one or a combination of the claimant's impairments meets or equals the severity of a listed impairment, the claimant is

*United States District Court*
*Northern District of California*

disabled.  20 C.F.R. § 404.1520(a)(4)(iii).  Otherwise, the analysis continues.  *See id.*

At step four, the ALJ must assess the claimant's residual functional capacity ("RFC") and past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  The RFC is "the most [a claimant] can still do despite [that claimant's] limitations . . . based on all the relevant evidence in [that claimant's] case record."  20 C.F.R. § 404.1545(a)(1).  The ALJ then determines whether, given the claimant's RFC, the claimant would be able to perform their past relevant work.  20 C.F.R. § 404.1520(a)(4).  Past relevant work is "work that [a claimant] has done within the past fifteen years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn how to do it."  20 C.F.R. § 404.1560(b)(1).  If the claimant is able to perform their past relevant work, then the ALJ finds that they are not disabled.  If the claimant is unable to perform their past relevant work, then the ALJ proceeds to step five.

At step five, the Commissioner has the burden to "identify specific jobs existing in substantial numbers in the national economy that the claimant can perform despite [the claimant's] identified limitations."  *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (quoting *Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995)).  If the Commissioner meets this burden, the claimant is not disabled.  *See* 20 C.F.R. § 404.1520(f).  Conversely, the claimant is disabled and entitled to benefits if there are not a significant number of jobs available in the national economy that the claimant can perform.  *Id.*

### B.    Supplemental Regulations for Determining Mental Disability

The Social Security Administration has supplemented the five-step general disability evaluation process with regulations governing the evaluation of mental impairments at steps two and three of the five-step process.  *See generally* 20 C.F.R. § 404.1520a.  First, the Commissioner must determine whether the claimant has a medically determinable mental impairment.  20 C.F.R. § 404.1520a(b)(1).  Next, the Commissioner must assess the degree of functional limitation resulting from the claimant's mental impairment with respect to the following functional areas: 1) understand, remember, or apply information; 2)  interact with others; 3) concentrate, persist, or maintain pace; and 4) adapt or manage oneself.   20 C.F.R. §§ 404.1520a(b)(2), (c)(3).  Finally, the Commissioner must determine the severity of the claimant's mental impairment and whether

United States District Court
Northern District of California

3

that severity meets or equals the severity of a mental impairment listed in Appendix 1.  20 C.F.R. § 404.1520a(d).  If the Commissioner determines that the severity of the claimant's mental impairment meets or equals the severity of a listed mental impairment, the claimant is disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii).  Otherwise, the evaluation proceeds to step four of the general disability inquiry, where the ALJ must address the claimant's RFC.  *See* 20 C.F.R. § 404.1520a(d)(3).

Appendix 1 provides impairment-specific "Paragraph A" criteria for determining the presence of various listed mental impairments, but all listed mental impairments share certain "Paragraph B" severity criteria in common (and some have alternative "Paragraph C" severity criteria).  *See generally* 20 C.F.R. § 404, Subpt. P, App. 1 at 12.00.  Any medically determinable mental impairment—i.e., one that satisfies the Paragraph A criteria of one or more listed mental impairments—is sufficiently severe to render a claimant disabled if it also satisfies the general Paragraph B criteria, which requires that a claimant's mental disorder "result in 'extreme' limitation of one, or 'marked' limitation of two, of the four areas of mental functioning."  *Id*. at 12.00(A)(2)(b). A claimant has a "marked" limitation if the claimant's "functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited."  20 C.F.R. § Pt. 404, Subpt. P, App. 1*,* 12.00(F)(2)(d).  A claimant with an "extreme" limitation is "not able to function in this area independently, appropriately, effectively, and on a sustained basis."  20 C.F.R. § Pt. 404, Subpt. P, App. 1*,* 12.00(F)(2)(e).

This evaluation process is to be used at the second and third steps of the sequential evaluation discussed above.  Social Security Ruling 96-8p, 1996 WL 374184, at *4 ("The adjudicator must remember that the limitations identified in the 'paragraph B' and 'paragraph C' criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process.").  If the Commissioner determines that the claimant has one or more severe mental impairments that neither meet nor are equal to any listing, the Commissioner must assess the claimant's residual functional capacity.  20 C.F.R. § 404.1520a(d)(3).  This is a "mental RFC assessment [that is] used at steps 4 and 5 of the sequential process [and] requires a more detailed assessment by itemizing various functions

4

contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments . . . . " Social Security Ruling 96-8p, 1996 WL 374184, at *4.

### C.    Procedural Background

On July 30, 2020, C.R. applied for supplemental security income ("SSI") under Title XVI of the Social Security Act and social security disability insurance ("SSDI") under Title II of the Social Security Act alleging disability beginning January 1, 2020.  AR 380-381.  His application was denied initially and upon reconsideration. AR 251-255 211.  C.R. timely requested a hearing, which was held on November 7, 2023 before Administrative Law Judge ("ALJ") Kevin Gill. AR 81-117, 267, 359. On February 27, 2024, the ALJ denied Plaintiff's application, AR 15-35, and on October 22, 2024, the Appeals Council denied Plaintiff's appeal of the ALJ's decision, AR 1-7, making it the final decision of the Commissioner.  After the Appeals Council denied review, Plaintiff sought review in this Court pursuant to 42 U.S.C. § 405(g).

### D.    Factual Background

C.R. is 53 years old.  AR 384.  He is currently homeless and lives in a tent or with acquaintances in Oakland, California. AR 670, 673.[3] He has been homeless multiple times in his life, starting when he was 14 years old.  AR 673. C.R. was raised by his mother.  AR 673.  His father was an alcoholic and was not involved in raising C.R.; his brother was killed by Oakland Police in 1990.  AR 673.  As a child, C.R. had learning and attention difficulties, struggling with reading and math.  AR 673.  He was diagnosed with a learning disability in Kindergarten, repeated both Second and Third Grades and was in special education from Fourth through Sixth grade.  AR 673, 1211.  He did not complete any further schooling or receive a GED certification.  AR 92, 673.  He testified that he can only read or write "a word or two" and cannot use a computer.  AR 96.

In 2019, C.R.'s wife of fifteen years died in his arms of an aneurysm.  AR 673.  C.R. testified that his "mind is just not right" since losing her and that he "just go[es] down and down,

---

[3] The address he lists on his application for benefits appears to be his mother's address, in Hayward, California, where he receives mail. AR 384, 522.

United States District Court
Northern District of California

further and further." AR 15. C.R. testified that he tried to "drink [himself] to death" after his wife's death but that he stopped drinking about two months before the November 2023 hearing before the ALJ. AR 95, 100. C.R. has a history of "problems with his legs" and told a consultative examiner that he was treated for blood clots by a Las Vegas Hospital before he moved back to Oakland. AR 668. He has liver and kidney problems related to his alcohol use and was treated at San Leandro hospital for abdominal ascites in 2021 after going to the emergency room with complaints of "gradually worsening pedal edema of the last 3-4 months" and "increasing abdominal girth for the past 2-3 months." AR 668, 1045.

C.R. testified at the hearing that since 2020 he had gone to the emergency room three times due to swelling of his legs and abdomen. AR 103. He testified that other than these trips to the emergency room he had not sought treatment because he was depressed and unable to focus or function after the death of his wife, because he was homeless and because he feared enclosed spaces and medical settings. AR 98-99, 104-105. However, he began to follow up with treatment a few months before the hearing because his pain had gotten worse. AR 94. At the time of the hearing, in November 2023, testing was still underway. AR 106 (C.R.'s attorney observing based on his medical records that "since [C.R.] really only started following up with [treatment] in July of [2023], they're still kind of in the process of giving him tests and figuring out . . . exactly what it is."). At that time, C.R. testified that he had difficulty walking and that he could not stand more than 15-20 minutes at a time due to pain in his legs. AR 90, 101.

According to C.R., before his wife's death in 2019, when he lived in Las Vegas, he worked as a sorter for a waste management company, but he was laid off after his supervisor noticed that he was not "on the line" because he needed to "lean back for a minute . . .and . . . rest [his] leg." AR 93. He testified that after he could not keep up with the conveyer belt he was briefly assigned other duties including "sweeping up downstairs" but he was not "able to perform" that job. AR 97. He testified that he had "head problems" and would "get frustrated" and would "just try to go away" but that his employer said he had "walked . . . off the job." AR 97.

### E.    The ALJ's Decision

At step one, the ALJ determined that C.R. had not engaged in substantial gainful activity

United States District Court
Northern District of California

since his January 1, 2020 alleged onset date. AR 20.

At step two, the ALJ determined that C.R. "has the following severe impairment: alcoholic liver disease." AR 21.

At step three, the ALJ found that C.R. "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1[,]" including Section 5.05 (Chronic Liver Disease).  AR 22.

At step four, the ALJ found that C.R. has the "residual functional capacity to perform the full range of medium work as defined in 20 CFR 404.1567(c) and 416.967(c)."  AR 23.

At step five, the ALJ found that considering C.R.'s "age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform."

## III.   ISSUES FOR REVIEW

C.R. contends the ALJ erred by: 1) "fail[ing] to properly articulate the factors of supportability and consistency with regard to the medical opinion evidence[;]" 2) improperly discounting the severity of C.R.'s claimed impairments at step two; 3) "fail[ing] to provide specific, clear and convincing reasons for rejecting Plaintiff's statements[;]" and 4) "fail[ing] to base the RFC finding on substantial evidence."  Plaintiff's Brief in Support of Reversal and Remand, dkt. no. 12 ("Opening Brief") at 1.  C.R. asserts that if the Court credits medical opinions and testimony that the ALJ improperly rejected, the evidence is sufficient to establish that he is disabled and therefore, the Court should reverse and remand to the Commissioner for award of benefits.  Alternatively, he asks the Court to reverse and remand for further proceedings.

## IV.   ANALYSIS

### A.  Standard of Review

District courts have jurisdiction to review the final decisions of the Commissioner and may affirm, modify, or reverse the Commissioner's decisions with or without remanding for further hearings.  42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3).   "An ALJ's disability determination should be upheld unless it contains legal error or is not supported by substantial evidence," which " 'means more than a mere scintilla, but less than a preponderance; it is such

United States District Court
Northern District of California

relevant evidence as a reasonable person might accept as adequate to support a conclusion.' " *Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014) (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007)). A court must consider evidence both supporting and detracting from the Commissioner's decision; if the evidence could reasonably support either outcome, the court may not substitute its judgment for that of the ALJ. *Id*. at 1010. Courts "review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." *Id*.

**B.**   **Whether the ALJ Adequately Addressed the Factors of Supportability and Consistency with Regard to the Medical Opinion Evidence**

### 1.   Background

#### a.   Relevant Medical Records and ALJ's Findings

##### i.   Dr. Wiebe

Katherine Wiebe, Ph.D., who was retained by C.R.'s counsel, completed a psychological evaluation of C.R. based on a two-and-a-half hour assessment conducted in two sessions, on April 28 and 29, 2021. AR 672-688. Due to the Covid 19 pandemic, the assessment was conducted by telephone. AR 673. Dr. Wiebe states in her report that "[l]imitations to validity include likely minimal alteration of data from telephonic administration." AR 673. She states further that while "[b]ackground information [was] considered limited as it was provided by the client[,] [r]esults [were] considered to have validity due to the congruency of [C.R.'s] presentation, interview information obtained, results of testing and his valid MCMI-IV test results." AR 673.

The assessment included: a Clinical interview; Mental Status/Psychiatric Symptoms Sheet; Barona Estimate (IQ); Repeatable Battery for the Assessment of Neuropsychological Status (RBANS)-Form A: Immediate Memory Index; Digit Span task from Attention Index; Language Semantic; Fluency Task; Montreal Cognitive Assessment, (MoCA) telephonic version; Beck Depression Inventory (BDI-11); Beck Anxiety Inventory (BAI); Posttraumatic Checklist for DSM-5 (PCL-5); and Million Clinical Multiaxial Inventory-IV (MCMI-IV). AR, 675; AR 672-688.

In the background section of Dr. Wiebe's report, she addressed C.R.'s "Current Living

Situation," "Family and Social History," "Academic, Employment and Legal History," "Medical History and Medications," "Psychiatric History," "Prior Psychological Testing," "Substance Abuse History," "Functional Exam," and "Behavioral Observations and Mental Status." AR 673-675. Among other things, Dr. Wiebe observed that there were no records of psychological treatment or testing available for review and that C.R. reported he had been referred to psychotherapy in the past "but never followed up[;]" that C.R. "first drank alcohol when he was 12 years old and drinks alcohol, usually five shots of Hennessey, every day, for about the last 20 years" but that he had never attended any substance treatment programs; and that C.R. "has problems with depression, anxiety, cognitive, somatic, and trauma related symptoms, and interpersonal functioning" and "[i]mpairments in insight, judgment and reasoning that affect his ability to make effective decisions and manage his personal affairs." AR 674

In the Behavioral Observations and Mental Status section of her report, Dr. Wiebe offered the following findings and observations:

> [C.R.'s] mood was depressed. His affect was restricted. He was responsive and cooperative in his attitude during this assessment. The assessment was conducted over two days due to problems he had from being homeless -- with finding a quiet and private place to talk. On the day of the first meeting, he expressed having forgotten about the appointment. On the next day, the appointment was delayed 40 minutes while he was in transit to a place where he could talk on the phone. He was alert. He expressed problems with comprehension of complex language. His speech was somewhat tangential, particularly, it seemed, in order to deflect painful emotional material and feelings of inadequacy about lack of understanding. He was preoccupied with grief and the loss of his wife. He cried at times when talking about her. He required frequent repetition of questions and directions. His effort was good. He evinced low frustration tolerance and being easily discouraged.
>
> [C.R.] was oriented to person, place, and basically to time. On the MoCA he only incorrectly reported the exact day of the week that it was; and said that the year was 2020 in 2021. He expressed passive suicidality. He expressed feelings of hopelessness, worthlessness, and guilt. He denied homicidality. He reported experiencing some hallucinations, only of his deceased wife, at night. He did not report or appear to be responding to internal stimuli during this assessment. He evinced impairments in insight, judgment, and reasoning associated with his psychiatric disorder problems.

AR 675.

Four pages of Dr. Wiebe's report are devoted to describing the results of her testing of

9

C.R.  AR 675-679.  These results include the following findings:

- "Based upon his Barona Estimate, his presentation, and his educational and occupational attainment, M[C.R.'s] premorbid IQ is estimated to be within the low average range, with learning impairment."
- "On the RBANS Attention, Digit Span task, he was able to repeat up to five digits forwards, performing in the borderline range for this task. On the MoCA, he was not able to repeat a string of five digits forwards; He could not repeat three digits backwards, correctly. He scored 0/1 on an Attention task in which he was required to respond to letter cueing, He could correctly subtract none of a string of five sevens starting from 100. He did not know how to calculate 12 minus five. He did know that eight plus four equals 12."
- [C.R.'s]  performance on the RBANS Immediate Memory Index placed him in the extremely low range of functioning, at the <0.1 percentile."
- "[C.R.] is estimated to have moderately to severely impaired functioning on tasks in this domain, which entails the ability to plan, sequence, abstract, and organize. He expressed tendency to lose track of tasks. On a Similarities, Abstraction task on the MoCA he scored 0/2."
- C.R. had "overall severely impaired abilities" with respect to language, scoring "in the 0. percentile, extremely low range, on the semantic fluency task of the RBANS."
- C.R.'s Beck Depression - II Inventory responses "indicated he has severe depression."
- C.R.'s Beck Anxiety Inventory responses "indicate that he is experiencing severe anxiety."
- "On the Posttraumatic checklist for DSM-5, [C.R.'s] responses indicated recently experiencing symptoms including: Intrusive memories; nightmares; flashbacks; being triggered by reminders; strong physical reactions from reminders; avoiding memories, thoughts, or feelings; avoiding people, places, conversations, activities, objects, or situations; trouble remembering parts of the experience; strong negative beliefs about his self, other people and the world including that he is bad, that there is something seriously wrong with him, that no one can be trusted, and that the world is completely dangerous; blaming himself or someone else concerning the experience; strong negative feelings such as, fear, horror, anger, guilt, or shame; loss of interest in activities that he used to enjoy; feeling distant or cut off from other people; trouble experiencing positive feelings; irritable behavior, angry outbursts, or acting aggressively; taking too many risks or doing things that could cause harm to himself; being hypervigilant; feeling jumpy or easily startled; having difficulty concentrating; and having trouble falling or staying asleep."

AR 675-677.   These findings are followed by two pages in which Dr. Wiebe quotes specific responses C.R. gave during testing.   AR 678-679. Dr. Wiebe also administered the MCMI-IV test, "an objective test of psychiatric functioning."  AR 679.  She devotes several pages to interpreting these results based on C.R.'s "profile."  AR 679-683. She concludes that C.R. has "problems with severe, recurrent depression, severe anxiety, Posttraumatic Stress Disorder; and alcohol use."  AR 683.

In the conclusion of her report, Dr. Wiebe describes the results of her assessment as follows:

10

> Results of this assessment indicate that [C.R.] has severe impairment in language; and memory functioning. He has moderate to severe attention/concentration; and executive impairment. He has moderate sensorimotor functioning impairment. He has mild overall intellectual functioning impairment, His ability to perform under individual structured assessment conditions does not necessarily reflect his ability to perform in a regular work environment. The evaluation of his medical problems is beyond the scope of this assessment.
>
> [C.R.] would have difficulties attending to, remembering, and following through with directions and tasks in a job situation due to his psychiatric disorder and cognitive functioning impairments. [C.R.] has problems with cognitive and perceptual distortions, with affect dysregulation, and difficulties with interpersonal relationships. He has depression and mood instability, severe anxiety, and Posttraumatic Stress Disorder symptoms; with ambivalence; low frustration tolerance; unpredictable and erratic behavior; distractibility; irritability; suspiciousness; agitation and restlessness; resentment; depressive fatigue; rumination; and expecting to be mistreated. He would have difficulties being able to relate and communicate effectively with supervisors, co-workers, and the public in a work environment.
>
> [C.R.] has psychiatric disorder problems as well as likely effects from long term learning problems and use of alcohol and that affect his cognitive functioning abilities. His psychiatric; interpersonal; cognitive; chronic homelessness; medical and somatic; substance use; and trauma history are inter-related. His use of alcohol is likely attempting to self-medicate as well as co-occurring with his psychiatric and personality disorder problems; his ongoing use of alcohol despite self-reported kidney and liver problems also reflects impairment in judgement and self-destructive tendency. Due to his psychiatric and cognitive functioning symptoms, he would have difficulties performing a regular job even if he were never to use alcohol or any substances again. He should benefit from psychological treatment including motivational interviewing for his co-occurring problems; and a safe and stable living environment.

AR 684. She diagnosed C.R. with "Major depressive disorder, Recurrent episode, Severe, with Anxious distress[,]" "Posttraumatlc stress disorder[,]" "Other specified personality disorder, Negativistic Personality Traits, Schizotypal Personality Traits, Paranoid Personality Traits, and Narcissistic Personality Traits[,]" "Unspecified neurocognitive disorder[,]" "Alcohol use disorder, severe[,]" and "[rule-out] Cannabis use disorder[.]" AR 684-685.

The ALJ found Dr. Wiebe's opinions to be unpersuasive because they were "based solely on a telephone interview" and "only on cursory screening tests." AR 26. He further found that the report was "full of conjecture, and several pages [were] copied from the MCMI report." AR 26. He also found that "the diagnoses and level of impairment [in Dr. Wiebe's report] [were] not

11

consistent with the treatment record" and that she "failed to account for the claimant's alcohol use." AR 26. According to the ALJ, "specific diagnoses like Major Depressive Disorder require that the clinician rule out other causes for symptoms, like substance use" and therefore "[w]ithout doing that, the most a clinician could reasonably diagnose during an introductory exam is an unspecified depressive disorder (used when someone displays depressive symptoms, but there is not enough information for a specific diagnosis)." AR 26. Finally, the ALJ found that "[t]he level of limitation this doctor identifies is an outlier, as the overall treatment record does not document any impairment – e.g., no crying, no depressed affect, no anxious presentation, no lack of cooperation - and all of these elements demonstrate that the opinion is more advocacy than neutral assessment." *Id.*

Elsewhere in his decision, the ALJ found that the opinion of State agency psychological consultant Mark Gilson, Ph.D. was "persuasive overall." AR 27. Gilson performed a record review on September 6, 2021 and made the following recommendations relating to development the record:

> A very detailed psychodynamic psychological evaluation was in record which suggests neurocognitive or neurodevelopmental impairment, but only cursory screening was performed. [Activities of Daily Living ("ADLS")] both from [Claimant ("CL")] and third party on file were blank. More current ADLS needed by CL and third party if possible. Also, psychotic symptoms were suggested. If a treatment source can produce a [Mental Status Examination ("MSE")] with symptoms, diagnoses, and the impact of symptoms on behavior and function, it should be put in record. Otherwise, an MSE by a qualified professional is needed. If there is significant evidence of a cognitive impairment, assessment should employ valid and reliable methods to evaluate cognitive functioning. CL also describes possible ETOH abuse, [4] which is not clearly defined and more is needed about this allegation. If the claim is not a fully favorable allowance based on physical impairments alone, then development for a potential discrete mental impairment will be needed with completion of [Psychiatric Review Technique Form ("PRTF")] and, if necessary, [a] [Mental Residual Functional Capacity Assessment ("MRFC")].

AR 705. The ALJ found that this opinion was "not really an opinion on what the claimant can do, but rather an assessment of the lack of evidence and the unreliability of the report from Dr. Wiebe in the face of that lack of evidence." AR 27.

---

[4] ETOH abuse means abuse of alcohol. *Morris v. Saul*, No. 18-CV-06672-JCS, 2020 WL 1307009, at *12 (N.D. Cal. Mar. 19, 2020).

ii. Dr. Stafford

After the November 7, 2023 hearing before the ALJ, consultative examiner Megan Stafford, Psy. D., completed a comprehensive psychological evaluation of C.R. AR 1211-1217. Dr. Stafford observed, *inter alia*, that C.R. was diagnosed with a learning disability in kindergarten and reported that he was "unable to read or spell"; that he began experiencing depression and anxiety in 2019, when his wife died, and that he had nightmares and difficulty sleeping; that he drank "a gallon of liquor daily"; that his "mood was dysthymic and his affect was congruent as he intermittently cried throughout the evaluation"; that his "memory was impaired"; that he was "able to say how many legs a dog has but he was unable to identify the colors of the American flag"; that he was "unable to calculate that seven quarters equaled $1.75[,]" "unable to complete serial 3s" and "unable to spell WORLD forward or backward"; that he "displayed poor insight and judgment." AR 1211-1214.

Dr. Stafford administered the Wechsler Adult Intelligence Scale-IV ("WAIS-IV"), the Wechsler Memory Scale-IV ("WMS-IV") and Trails A & B. AR 1214. On the WAIS-IV, C.R.'s full scall IQ was 48, placing him in the moderate intellectual disability range, but Dr. Stafford opined that this did "not appear to be a reliable estimate of [C.R.'s] current intellectual functioning as he did not appear to put forth adequate effort." AR 1215. On the WMS-IV, "[t]he scores [C.R.] obtained were varied and placed him in the Moderate to Mild Intellectual Disability Range" but Dr. Stafford again opined that this did "not appear to be a reasonably valid and reliable estimate of his current memory functioning due to his questionable effort." On the Trails A and B, C.R.'s results were "suggestive of dysfunction in visual scanning, psychomotor speed, and/or focusing and shifting attention." AR 1216. However, the Trails B "was discontinued due to claimant's inability to follow the sequence of the task." AR 1216. Dr. Stafford commented that C.R. "was able to attend to the interview" but he "did not put forth adequate effort and the results should be interpreted with caution. For instance, he was unable to answer any of the questions correctly on the Matrix Reasoning Subtest and stated, 'I can't complete anything.'" AR 1216.

Dr. Stafford listed the following diagnoses: "Unspecified Depressive Disorder"; "Unspecified Anxiety Disorder"; "Alcohol Use Disorder"; "Cannabis Use Disorder"; and

"Rule-out Specific Learning Disorder." AR 1216. She opined, "[c]linical observation and [C.R.'s] pattern of performance suggest overall intellectual ability within the borderline intellectual functioning range." AR 1216. She further found that C.R.'s "memory function revealed deficits." AR 1216. Her functional assessment of C.R. was as follows:

> The claimant's ability to perform simple and repetitive tasks is unimpaired.
>
> The claimant's ability to perform detailed and complex tasks is moderately impaired due to a history of requiring additional resources to complete tasks.
>
> The claimant's ability to accept instructions from supervisors is moderately impaired due to memory deficits.
>
> The claimant's ability to interact with co-workers, supervisors, and the public is moderately impaired due to a history of poor judgement and insight, emotional dysregulation, and interpersonal skills deficits.
>
> The claimant's ability to perform work activities on a consistent basis without special or additional instructions is mildly impaired.
>
> The claimant's ability to maintain regular attendance in the workplace is mildly impaired.
>
> The claimant's ability to complete a normal workday/workweek without interruptions from a psychiatric condition is moderately impaired due to his mental health symptoms.
>
> The claimant's ability to deal with the usual stress encountered in the workplace is moderately impaired due to his emotional dysregulation, low frustration tolerance, and poor insight and judgement.

*Id.* at 1217.

The ALJ found Dr. Stafford's opinion to be "partially persuasive," finding that her opinions with respect to the abilities she found to be unimpaired or only mildly impaired were persuasive but her opinions as to the abilities she found to be moderately impaired were unpersuasive. AR 27. He reasoned that as to the moderate limitations, Dr. Stafford's opinions relating to "cognitive ability" were "unreliable," citing Dr. Stafford's statements that C.R. did not "put forth sufficient effort in testing and that the results should be interpreted with caution." AR 27. He also found that Dr. Stafford acknowledged that C.R. "drinks a gallon of liquor daily, and smokes 'a lot of marijuana' daily" and concluded that she was "unable to rule out substance use as the cause of the claimed symptoms and was unable to come to a firm diagnosis." AR 27. He also

14

noted that a "number of the doctor's functional assessments [were] based on the claimant's history reports" but found the opinion of Dr. Hopper (discussed below) that the record as a whole does not establish any mental impairments to be "largely persuasive." AR 28.

### iii. Dr. Hopper

At the November 2023 hearing, medical expert Laura Hopper appeared and testified. AR 83. The ALJ asked Dr. Hopper what impairments the record established and she testified that the "only indication about mental health" was Dr. Wiebe's report, stating further:

> [t]he rest of the record is fairly medically based, but it does indicate that there is a alcohol use disorder that has been present which would -- may contribute to mental health symptoms. [Dr. Wiebe's report][5] suggests that [C.R.] experiences symptoms related to depression, anxiety, and post-traumatic stress disorder. There just isn't anything in the treating records that support the view[s] that are found in [Dr. Wiebe's report]."

AR 86. As discussed above, the ALJ found Dr. Hopper's opinion was "largely persuasive." AR 28.

### b. ALJ's Alleged Errors

C.R. asserts the ALJ committed the following harmful errors in rejecting the opinions of Dr. Wiebe:

- The ALJ improperly discounted her opinions because she conducted the assessment by telephone, providing no explanation of why this rendered her results less reliable.

- The ALJ improperly rejected the report as "no more than advocacy" even though he did not identify any impropriety on Dr. Wiebe's part and the Ninth Circuit has held that "in the absence of other evidence to undermine the credibility of a medical report, the purpose for which the report was obtained does not provide a legitimate basis for rejecting it."

- The ALJ improperly found that Dr. Wiebe's opinion was an "outlier" and

---

[5] Dr. Hopper mistakenly referred to Dr. Wibe's report as "the consultative evaluation." The ALJ later corrected her, pointing out that the report was completed by "one of the doctors that's in contract with Counsel's firm." AR 86.

inconsistent with the overall treatment record, relying on "mental status examination findings and progress notes from Plaintiff's hospital visits pertaining solely to his physical health[,]" which "do not undermine the functional limitations opined to by Dr. Wiebe, who performed a comprehensive mental status evaluation of Plaintiff and made findings supported by objective testing."

- The ALJ failed to address Dr. Wiebe's psychological evaluation test results, which provided objective evidence of the functional limitations she found.

- The ALJ erred in finding that Dr. Wiebe did not take into account C.R.'s alcohol use and improperly "played doctor" in finding that Dr. Wiebe's diagnosis was incorrect because she did not have enough information to make a definitive diagnosis.

Opening Brief at 5-9.

C.R. challenges the ALJ's finding that Dr. Stafford's opinions were only partially persuasive" on the ground that the ALJ failed to articulate "which parts of Dr. Stafford's opinion he finds persuasive and whether Dr. Stafford's findings about the Plaintiff being unimpaired are also comprised by the reasons he sets forth for finding the moderate limitations unpersuasive." *Id.* at 10.

According to C.R., the ALJ also erred in failing to offer any explanation for his finding that Dr. Hopper's opinions were consistent with or supported by the record. AR 11. C.R. further asserts that Dr. Hopper's opinion was, in fact, *not* consistent with the record as a whole as she did not address inconsistent findings by Drs. Stafford and Wiebe. AR 11.

### 2. Legal Standards

In reviewing medical source opinions, an ALJ must "articulate . . . how persuasive" they find "all of the medical opinions" in the claimant's case record. 20 C.F.R. § 404.1520c(b). The ALJ should consider various factors, the most important of which are supportability and consistency. 20 C.F.R. § 404.1520c(c). Supportability is "the extent to which a medical source supports the medical opinion by explaining the 'relevant . . . objective medical evidence.' " *Woods v. Kijakazi*, 32 F.4th 785, 791 (9th Cir. 2022) (quoting 20 C.F.R. § 404.1520c(c)(1)). Consistency

16

is "the extent to which a medical opinion is 'consistent . . . with the evidence from other medical sources and nonmedical sources in the claim.' " *Id.* at 792 (quoting 20 C.F.R. § 404.1520c(c)(2)). "[A]n ALJ cannot reject an examining or treating doctor's opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence." *Id.;* see also 20 C.F.R. § 404.1520c(b)(2) (providing that the ALJ must explain how they considered supportability and consistency in evaluating medical opinions).

An ALJ generally is not required to explain how other factors were considered, including the medical source's relationship with the claimant, the length and purpose of the treatment relationship, the frequency of examinations, and the source's specialization. 20 C.F.R. § 404.1520c(b)(2), (c). However, if the ALJ finds that "two or more medical opinions about the same issue are both equally well-supported . . . and consistent with the record but are not exactly the same[,]" then the ALJ should articulate how they considered the other "most persuasive" factors listed in the regulation. 20 C.F.R. § 404.1520c(b)(3).

An ALJ satisfies the "substantial evidence" requirement by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating [their] interpretation thereof, and making findings." *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)). "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors, are correct." *Id*.

### 3. Discussion

The Court finds that the ALJ committed a number of legal errors in evaluating the medical opinions of Drs. Wiebe and Stafford and that his conclusions regarding those opinions are not supported by substantial evidence.

As a preliminary matter, the ALJ appears to have discounted Dr. Wiebe's opinions in part because her examination was conducted over the telephone.  Yet the ALJ offers no explanation of why Dr. Wiebe's evaluation was in any way less accurate due to the fact that it was done by telephone.  Her report includes detailed descriptions of C.R.'s responses and she was able to make observations relating to his mood, his orientation to person, place and time, his alertness and his

United States District Court
Northern District of California

effort, among other things. *See* generally AR 672-688. Further, while the Commissioner asserts in his brief the Dr. Wiebe "acknowledged that some limitations to the validity of the report could result from the telephonic nature of the examination[,]" Commissioner's Brief at 16, he mischaracterizes Dr. Wiebe's report by ignoring her statement that telephone administration likely resulted in "*minimal* alteration of data" and her further conclusion that her results had "validity due to the congruency of [C.R.'s], presentation, interview information obtained, results of testing; and his valid MCMI-IV test results." AR 673 (emphasis added). The Court finds that to the extent the ALJ found lack of supportability based on the fact that the examination was conducted telephonically, that finding is not based on substantial evidence. *See Collin Q. D. v. Comm'r of Soc. Sec.*, No. C24-1057-BAT, 2024 WL 4930181, at *2 (W.D. Wash. Dec. 2, 2024) (finding that ALJ's "rationale that the doctor's opinions should be discounted because it was performed over the phone" was not supported by substantial evidence where "the ALJ provided no explanation as to why a telephone evaluation affected the accuracy of the evaluation.").

The ALJ also discounted Dr. Wiebe's findings as "cursory," "speculative" and "mere advocacy." These conclusions also are not supported by substantial evidence. First, the ALJ appears to have interpreted Dr. Gilson's opinion that Dr. Wiebe's testing was "cursory" as an opinion that the test results Dr. Wiebe *did* obtain were "unreliable." *See* AR 27. Dr. Gilson did not state as much in his review, however, and indeed, he opined that Dr. Wiebe's examination "suggest[ed] neurocognitive or neurodevelopmental impairment," warranting further development of the record. AR 705. Second, the portion of Dr. Wiebe's report that the ALJ found to be "speculative" – the section containing Dr. Wiebe's "MCMI-IV interpretive results" – consists of four and a half pages of her report; even if the ALJ's rejection of these "interpretative results" of the MCMI-IV was supported by substantial evidence, he fails to address the test results that were discussed in the remaining twelve and a half pages of the report that were offered by Dr. Wiebe in support of her conclusions with respect to the degree of C.R.'s mental impairment. Furthermore, to the extent the ALJ dismisses Dr. Wiebe's report as "advocacy" he erred because the mere fact that she was retained by C.R.'s counsel is not a proper ground to discount a medical opinion. *Reddick v. Chater*, 157 F.3d 715, 726 (9th Cir. 1998) ("[T]he mere fact that a medical report is

18

provided at the request of counsel or, more broadly, the purpose for which an opinion is provided, is not a legitimate basis for evaluating the reliability of the report.").

The ALJ also discounts Dr. Wiebe's opinions on the basis "the diagnoses and level of impairment are not consistent with the treatment record," AR 26, but this finding also is not supported by substantial evidence. The ALJ did not elaborate on this finding or cite specific evidence in support of this conclusion and for this reason alone his finding is not supported by substantial evidence. To the extent he relied on the evidence cited in the Commissioner's brief, that evidence also is not sufficient to support his conclusion. *See* Commissioner's Brief at 17-18 (citing AR 610 (3/18/20 emergency department treatment of right lower extremity pain and swelling), 631 (4/16/20 emergency department treatment of urinary retention and malfunctioning foley catheter), 640 (4/13/2020 emergency department treatment of urinary retention), 740-41 (same), 760 (4/14/2020 emergency department treatment of urinary retention and malfunctioning foley catheter), 805 (4/12/2020 emergency department treatment of urinary retention and possible cystitis), 900 (9/21/2020 emergency department to hospital admission treatment for various medical issues), 955 (7/25/2023 emergency department treatment for abdominal distension), 996 (9/21/2020 emergency department to hospital admission treatment for various medical issues), 1005 (same), 1020 (same), 1034 (same), 1040 (same), 1047 (same), 1118 (8/15/2023 urgent care treatment follow-up after "multiple [emergency department] visits due to cirrhosis"), 1179 (3/18/20 emergency department treatment of right lower extremity pain and swelling)). In particular, all of these observations were made in the context of emergency treatment of medical conditions. There is no indication that any of the medical providers who made these treatment notes were mental health providers and the ALJ does not explain why, in this context, their normal findings relating to C.R.'s mental status on a checklist of physical and mental characteristics would be more persuasive or supportable than the opinions of a trained mental health professional who conducted three hours of testing of C.R. *See Inez Laura R. v. Kijakazi*, No. 22-CV-04665-DMR, 2023 WL 6317622, at *6 (N.D. Cal. Sept. 26, 2023) (holding records reflecting that claimant "had at times . . . a normal mood and affect, full orientation, or a normal memory in non-mental health visits" were not sufficient to undermine the functional limitations or the severity of

19

the impairments opined to by a doctor who performed a psychological evaluation of the claimant at the request of the Social Security Administration and "performed a comprehensive psychological evaluation" of the claimant).

Finally, the ALJ states that Dr. Wiebe did not address C.R.'s alcohol use and discounts her diagnosis of Major Depressive Disorder ("MDD") on the basis that Dr. Wiebe could only have diagnosed MDD "unspecified" based on her examination of C.R.  But Dr. Wiebe expressly addressed C.R.'s alcohol use, undercutting the ALJ's conclusion that Dr. Wiebe did not take C.R.'s alcohol use into account in diagnosing him. *See* AR 674.  Furthermore, the ALJ's conclusion that Dr. Wiebe could only make "unspecified" diagnoses based on her examination of C.R. is not supported by any citation and instead appears to be based on the ALJ's own "independent medical findings," amounting to an impermissible substitution of his own opinion for that of a doctor who specializes in mental health care.  *See   Evelyn J. v. Comm'r of Soc. Sec.*, No. C19-5090 BAT, 2019 WL 2591033, at *2 (W.D. Wash. June 25, 2019)("As this Court has counseled on many occasions, ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.") (citation omitted).

Similarly, the ALJ did not properly evaluate the opinions of Dr. Stafford, who performed a consultative examination of C.R. after the hearing before the ALJ.  While Dr. Stafford's findings are not identical to those of Dr. Wiebe, there is significant overlap in their findings.  Under these circumstances, the ALJ should have addressed the factors set forth above to explain why the opinions of one or the other were more persuasive. Instead, the ALJ simply endorsed as persuasive the findings that he found consistent with his previous conclusion that C.R. had no mental impairments that significantly limited his functioning while rejecting the opinions of Dr. Stafford that suggested that C.R. had more than mild impairments in some areas.

Dr. Hopper's opinion, which the ALJ found to be persuasive, does not offer substantial evidence for discounting the opinions of Dr. Stafford or Dr. Wiebe. Dr. Stafford did not complete her assessment until after Dr. Hopper offered her opinions at the hearing and therefore, Dr. Hopper's opinion has no bearing on whether Dr. Stafford's opinions should be credited. As to Dr. Wiebe, Dr. Hopper offered no meaningful explanation of her conclusion that Dr. Wiebe's findings

were not supported by the record as a whole;  to the extent she relied on the observations made by emergency department providers discussed above, her opinion was not supported by substantial evidence for the reasons discussed above.[6]

For these reasons, the Court concludes that the ALJ's evaluation of the medical opinions of Dr. Wiebe, Dr. Stafford and Dr. Hopper regarding C.R.'s mental impairments and associated functional limitations was flawed.

**C.     Whether the ALJ Failed to Properly Assess the Severity of C.R.'s Impairments at Step Two**

**1.  Background**

At step two, the ALJ found that C.R.'s only severe impairment was alcoholic liver disease. AR 21.  He considered but found non-severe a "history of blood clots in the legs," obesity, PTSD, alcohol use disorder, unspecified depressive disorder and unspecified anxiety disorder. AR 21.

Regarding C.R.'s history of blood clots, the ALJ stated:

> Although a right lower extremity venous Doppler ultrasound in March 2020 showed extensive nonocclusive deep vein thrombosis (DVT) and he was diagnosed with acute DVT of right femoral vein (1F/ 11, 14 [AR 613, 616]), an ultrasound study of both of his lower extremities in September 2020 did not reveal any acute DVT despite the claimant being noncompliant with taking his anticoagulation medications. (1F/ 64).[7]

AR 21.  Later in his decision, when evaluating C.R.'s RFC, the ALJ noted findings of consultative examiner Dr. Eugene McMillan, who conducted an internal medicine evaluation on March 25, 2021.  AR 24.  Dr. McMillan found that C.R. had "normal gait (no limp, full weightbearing, normal rate), had normal Romberg, and had normal tandem gait" and that C.R. "had normal 5/5 strength throughout" and his "[n]eurologic exam was normal[,]" diagnosing C.R. with possible

---

[6] The Court rejects the Commissioner's assertion that the ALJ was not required to discuss the supportability and consistency factors in connection with Dr. Hopper's opinion because Dr. Hopper's testimony constituted "other medical evidence" rather than a medical opinion. Commissioner's Brief at 20-21 (citing 20 C.F.R. §§ 404.1513(a)(3), 416.913(a)(3)).  Dr. Hopper is a medical source and her opinions about whether the mental impairments and functional limitations found by Dr. Wiebe were consistent with the treatment record as a whole amount to opinions about what C.R. "can still do despite [his] impairment(s) and whether [he has] one or more impairment-related limitations or restrictions" under the Social Security Act.  *See*  20 C.F.R. § 416.913)a)(2) (defining "medical opinion").

[7] The cited page does not exist.  It appears that the ALJ intended to cite to Exhibit 16F at p. 64, found at AR 1013.

United States District Court
Northern District of California

United States District Court
Northern District of California

history of blood clots in legs and alcoholic liver disease." AR 24 (citing Exhibit 7F/3 [AR 670]). However, the ALJ rejected Dr. McMillan's functional assessment, including his finding that C.R. could stand, walk or sit no more than 6 hours in an 8-hour day, finding that Dr. McMillan's opinions were "minimally persuasive" because he pointed to "no clinical findings supporting [his] assessment, and he [did] not provide any significant explanation." AR 25-26.

With respect to C.R.'s alleged mental impairments, the ALJ found that C.R.'s "medically determinable mental impairments of alcohol use disorder; unspecified depressive disorder, without any symptoms reflected in the treatment record; and unspecified anxiety disorder, without any symptoms reflected in the treatment record, considered singly and in combination, do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore nonsevere." AR 21. He stated that in making this finding, he had considered the "broad functional areas of mental functioning set out in the disability regulations[,]" (the "Paragraph B criteria") and found that C.R. had "no limitations." AR 21-22.

C.R. argues that the ALJ erred in "failing to find that the following are medically determinable impairments that significantly limit claimant's ability to perform basic work activities as required by SSR 85-28: deep vein thrombosis (DVT), depression, learning disability, and post-traumatic stress disorder (PTSD)." Opening Brief at 12.

### 2. Legal Standards

"[T]he step two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996) (citing *Bowen v. Yuckert*, 482 U.S. 137, 153–54 (1987)). "A claim may be denied at step two only if the evidence shows that the individual's impairments, when considered in combination, are not medically severe, i.e., do not have more than a minimal effect on the person's physical or mental ability(ies) to perform basic work activities." Social Security Ruling ("SSR") 85–28. The omission of an impairment at step two can only be harmful if it prejudices the claimant in steps three through five. *Burch v. Barnhart*, 400 F.3d 676, 682 (9th Cir. 2005).

### 3. Deep Vein Thrombosis

The Court finds that the ALJ erred in finding that C.R.'s deep vein thrombosis was non-

22

severe under the lenient standard set forth above.

The ALJ cited only two treatment records in support of his finding that C.R.'s deep vein thrombosis was not a severe impairment:  1) a treatment note from the emergency department dated  March 18, 2020 stating that C.R.'s right leg was swollen and that an ultrasound revealed that he suffered from "[e]xtensive nonocclusive deep venous thrombus . . . extending from the mid right femoral vein to the level of the proximal right popliteal vein."  AR 21 (citing Exhibit 1F/ 8, 11 [AR 610, 613]); and 2) a treatment note from September 21, 2020 referring to another ultrasound that did *not* find deep vein thrombosis in C.R.'s legs.  AR 21 (erroneously citing Exhibit 1F/64, presumably referring to Exhibit 16F/64 [AR 1013]).[8]

The ALJ did not explain why the first treatment note, from March 18, 2020, supported his conclusion that C.R.'s deep vein thrombosis was not a severe impairment and in fact, that treatment note supports the opposite conclusion, reflecting that C.R. experienced pain and swelling of his lower right leg and confirming the existence of deep vein thrombosis.  Nor did the ALJ explain why he placed greater weight on the September 2020 ultrasound that did not show deep vein thrombosis.  The ALJ also apparently discounted the numerous references in the medical records to C.R.'s history of treatment for blood clots, including evidence that multiple doctors had prescribed anticoagulants to treat that condition.  *See, e.g.*, AR 608 (3/18/2020 treatment note prescribing Xarelto for deep vein thrombosis), AR 629 (4/16/2020 treatment note listing diagnosis of deep vein thrombosis and noting that C.R. reported a history of blood clots in his legs in 2019), AR 668 (report of CE Dr. McMillan based on 3/25/21 examination noting that C.R. told him that after his wife died he was seen for blood clots in his legs at the emergency department  of a Las Vegas hospital, where the hospital recommended admission for treatment of blood clots and prescribed Xarelto).  Nor did he address the treatment note from the same September 2020 hospital visit reflecting that C.R. experienced pain and swelling in his right leg and complained of gradually worsening pedal edema bilaterally over the last 3-4 months."  AR

---

[8] The ultrasound results to which the ALJ presumably intended to refer (though he did not provide a citation in his decision) can be found at AR 848.  The results of that ultrasound include the following conclusion: "no evidence of venous thrombosis. No findings to explain the patient's clinical condition as described." AR 848.

1001. Indeed, the ultrasound findings reflect that the absence of deep vein thrombosis left unexplained C.R.'s "clinical condition." AR 848. The ALJ also did not explain why he apparently relied on observations by Dr. McMillan relating to C.R.'s "normal gait" and "normal strength" even while finding his opinions with respect to C.R.'s functional limitations "largely unpersuasive" due to the lack of clinical findings.

Therefore, the Court finds that the ALJ's conclusion at step two that C.R.'s deep vein thrombosis was not a severe impairment is not supported by substantial evidence. Further, this error resulted in prejudice to C.R. because the ALJ included no limitations in the RFC relating to C.R.'s leg pain.

The Court further concludes that the ALJ failed in his duty to develop the record with respect to C.R.'s deep-vein thrombosis diagnosis. While the record reflects that C.R. visited the emergency room on multiple occasion for swelling of his right leg, the two ultrasounds in the record appear to have revealed conflicting results. Furthermore, the consultative examiner who conducted an internal medicine examination (Dr. McMillan) found that C.R.'s ability to stand, walk and sit was limited but did not – according to the ALJ – make "clinical findings" to support that conclusion. " 'In Social Security cases the ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered.'" *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996) (quoting *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983)). "This duty exists even when the claimant is represented by counsel." *Id*. In light of the ambiguities and gaps in the record with respect to this impairment, the Court finds that the ALJ erred by failing to adequately develop the record.

### 4. Depression, PTSD and Learning Disability

The ALJ's findings that C.R. had no functional limitations associated with his mental impairments are based on his flawed evaluation of the opinions of Drs. Wiebe, Stafford and Hopper, discussed above. Therefore, the Court concludes that his conclusion that C.R.'s depression, PTSD and learning disability are not severe at step two is not supported by substantial evidence for the reasons discussed above. Further, the ALJ did not include any limitations associated with these impairments in C.R.'s RFC and therefore, this error was prejudicial.

United States District Court
Northern District of California

United States District Court
Northern District of California

**D.    Whether the ALJ Provided Clear and Convincing Reasons for Failing to Credit C.R.'s Testimony**

### 1.    Background

At the hearing, C.R. testified, *inter alia*, that at a previous job working as a sorter on a conveyor belt he had to take breaks to rest his leg and he couldn't keep up with the pace (AR 93); that he was not able to perform alternative duties sweeping because it required too much standing (AR 97); that he gets "frustrated a lot" and doesn't get along with people so he "[tried] to go away" and was fired for walking off the job (AR 97); that he has panic attacks and crying spells "every day" and "barely sleeps (AR 90, 99); that due to depression he is unable to "even want to get up" or "do anything" for himself (AR 100); that he can stand for no more than 15 or 20 minutes at a time because his legs go numb and he experiences "unbearable pain" (AR 101); that he can't wash himself in the shower because he can't "stand too long" (AR 93); that he hasn't been able to focus (AR 98); and that although he had recently stopped drinking prior to the hearing, the pain in his legs had gotten worse, causing him to seek treatment (AR 94, 106).

The ALJ found that "the claimant's statements about the intensity, persistence, and limiting effects of his symptoms" were "inconsistent because the evidence as a whole indicates that, despite his impairments, the claimant can perform the full range of medium work." AR 24. The ALJ went on to summarize treatment notes for C.R.'s September 2020 emergency room visit that led to admission to the hospital (Exhibit 16F); the observations of consultative examiner Dr. McMillan (Exhibit 7F); a July 25, 2023 visit to the emergency department with complaint of ascites; and an October 9, 2023 office visit (17F), which he pointed to support his finding that "[s]ubsequent treatment records indicate[d] that the claimant experienced improvement since he decreased his alcohol consumption." AR 24.

As to the September 2020 hospital treatment notes, the ALJ noted that: 1) C.R. was observed to "have 3+ pitting edema as well as tense ascites and an ER physician performed a large volume paracentesis where 12.45 liters of ascitic fluid was removed" but that "[a] Doppler of his bilateral legs done in the ER was negative for DVT in both legs[;]" 2) C.R. reported that "he became noncompliant with his anticoagulation medication (prescribed for his prior history of DVT) after the loss of his wife" and that "[h]e was seen in the emergency room (ER) at Eden in

25

March and was switched to Xarelto, but he stopped all of his anticoagulation medication about 3 months ago[;]"  and 3) "[h]e reported drinking 3 to 4 bottles of brandy a day " and his "principal discharge diagnosis was ascites due to alcoholic cirrhosis."  AR 24.

The ALJ described Dr. McMillan's findings from his physical examination of C.R. as "generally unremarkable," pointing to his findings that C.R. "had normal gait (no limp, full weightbearing, normal rate), had normal Romberg, and had normal tandem gait" and that he "had normal 5/5 strength throughout" and "[n]eurologic exam was normal."  AR 24 (citing Exhibit 7F).

The ALJ noted that at the July 25, 2023 emergency department visit  C.R. reported he had "continued to drink since his 2020 admission" "consuming one pint of liquor daily[;]" that on "physical examination, the claimant's abdomen was distended and ascites were present[;]" that "[e]xamination of the extremities showed 5/5 strength in the bilateral upper and lower extremities, 1+ edema of the bilateral lower extremities, lymphedema in the left lower extremity, and no erythema[;]" and that although he had "worsening labs since his prior admission in 2020 . . . he was asymptomatic and did not currently require emergent paracentesis and he had no fever and no abdominal pain."  AR 24 (citing Exhibit 16F).

Regarding the October 9, 2023 office visit, the ALJ stated that C.R. "reported a significant decrease in alcohol use and was now drinking one to two drinks every few weeks[;]"  that C.R. denied hematemesis, hematochezia, melena abdominal pain, abdominal enlargement, and fever[;]" that he "also reported no changes in mentation/behavior and no disturbance in sleep[;]" and that there was "no evidence of ascites."  AR 24-25 (citing Exhibit 17F).

### 2. Legal Standards

In assessing a claimant's subjective testimony, an ALJ conducts a two-step analysis. *Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017). The ALJ must first determine "whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1102 (9th Cir. 2014) (cleaned up). If the claimant does so, and there is no affirmative evidence of malingering, then the ALJ can reject the claimant's testimony as to the severity of the symptoms "only by offering specific, clear and convincing reasons for

26

doing so." *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (cleaned up). "These findings, properly supported by the record, must be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding pain." *Bunnell v. Sullivan*, 947 F.2d 341, 345–346 (9th Cir. 1991) (en banc). "General findings are insufficient." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998). "Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Orn v. Astrue*, 495 F.3d 625, 636 (9th Cir. 2007) (cleaned up).

### 3. Discussion

As a preliminary matter, the Court rejects the Commissioner's assertion that the ALJ gave valid reasons for rejecting C.R.'s testimony because "the ALJ pointed to evidence that affirmatively suggested malingering."  Commissioner's Brief at 4 (citing AR 22).  In particular, the Commissioner points to Dr. Stafford's statements that C.R. did not put in "adequate effort" as to some tests and did not complete one of the subtests. *Id.*   But the definition of "malingering" offered by the Commissioner makes clear that this argument fails.  According to the Commissioner, " '[t]he essential feature of malingering is the *intentional* production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives such as . . . obtaining financial compensation . . . or obtaining drugs.' " *Id.*  (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 726 (5th ed. 2013) (DSM-V) (emphasis added)).  The statements of Dr. Stafford do not suggest that C.R.'s lack of effort when she was administering tests was intentional.  Rather, she indicated that C.R. was "*not able* to attend to the interview" and was "*unable* to answer any of the questions correctly on the Matrix Reasoning Subtest and stated, "I *can't* complete anything."  AR 1216 (emphasis added).  Indeed, the ALJ himself did not find that C.R. was malingering.

Therefore, the Court rejects the Commissioner's argument that the ALJ was not required to offer specific, clear and convincing reasons for discounting C.R's testimony regarding his

27

functional limitations on the grounds of malingering.  Furthermore, the ALJ's description of a handful of medical records does not meet this requirement as he did not explain how this evidence related to any specific testimony offered by C.R.   In addition, to the extent the ALJ relied on a single doctor visit on October 9, 2023 in which C.R. reported he had significantly reduced his alcohol consumption to conclude that C.R.'s medical condition had improved, this does not provide a sufficient explanation for his failure to credit C.R.'s testimony because the ALJ fails to explain how that single treatment note can be reconciled with the July 25, 2023 emergency department treatment note that C.R. had "continued to drink alcohol" since 2020 and consumed a pint of liquor daily, AR 954, and the report of CE Dr. Stafford, who examined C.R. on December 11, 2023 and noted that C.R. drank "a gallon of liquor daily."  AR 1213.  Even if citation to these cherry-picked medical records were sufficient to support discounting C.R.'s testimony relating to his exertional limitations, they do not shed *any* light on the non-exertional limitations to which C.R. testified, including his panic attacks, inability to focus, difficulty getting along with coworkers and inability to read, write or use a computer.

Therefore, the Court finds that the ALJ failed to provide adequate reasons for discounting C.R.'s symptom testimony.

### E.    Remedy

"A district court may affirm, modify, or reverse a decision by the Commissioner 'with or without remanding the cause for a rehearing.'" *Garrison v. Colvin*, 759 F.3d at 1019 (quoting 42 U.S.C. § 405(g)) (emphasis omitted). "If additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded." *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981).  On the other hand, the court may remand for award of benefits under the "credit as true" rule where: (1) "the ALJ failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion"; (2) "there are [no] outstanding issues that must be resolved before a disability determination can be made" and "further administrative proceedings would [not] be useful"; and (3) "on the record taken as a whole, there is no doubt as to disability." *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017) (citations and internal quotation marks omitted); *see also Garrison*, 759 F.3d at 1021 (holding that

United States District Court
Northern District of California

28

a district court abused its discretion in declining to apply the "credit as true" rule to an appropriate case).

Here, the Court declines to award benefits under the credit-as-true rule. As discussed above, a legally adequate evaluation of the medical opinions in the record is required, the record itself requires further development, and C.R.'s symptom testimony needs to be addressed in an adequate manner. Therefore, the Court concludes that remand for further proceedings is warranted.[9]

## V.    CONCLUSION

For the reasons stated above, the Court reverses the decision of the Commissioner and remands for further proceedings.

**IT IS SO ORDERED.**

Dated:  March 19, 2026

_____
JOSEPH C. SPERO
United States Magistrate Judge

United States District Court
Northern District of California

---

[9] The Court need not address C.R.'s challenge based on the inadequacy of the RFC found by the ALJ.  Presumably, on remand the Commissioner will revisit C.R.'s RFC to correct the errors identified herein if appropriate.

29